UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
ADITZA M. FERNANDEZ,                          :
                                              :
                        Plaintiff,            :
                                              :          **OPINION AND ORDER**
        -against-                             :           11-CV-1644 (DLI)
                                              :
MICHAEL J. ASTRUE,                            :
Commissioner of Social Security,              :
                                              :
                        Defendant.            :
-----------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

On October 31, 2007, Plaintiff Aditza M. Fernandez ("Plaintiff") filed an application for

Social Security disability insurance benefits ("DIB") and, on January 11, 2008, filed an

application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act").

(R. 109-11, 112-15.)[1]  On March 24, 2008, these applications were denied and Plaintiff filed a

written request for a hearing.  (R. 57, 58, 62-68, 69-71.)  On August 18, 2009, Plaintiff appeared

with counsel and testified at a hearing before Administrative Law Judge David Nisnewitz (the

"ALJ").  (R. 30.)  By a decision dated September 4, 2009, the ALJ concluded Plaintiff was not

disabled within the meaning of the Act.  (R. 29.)  On February 5, 2011, the ALJ's decision

became the Commissioner's final decision when the Appeals Council denied Plaintiff's request

for review.  (R. 1-5.)

Plaintiff filed the instant appeal seeking judicial review of the denial of benefits, pursuant

to 42 U.S.C. § 405(g).  (Complaint ("Compl."), Doc. Entry No. 1.)  The Commissioner moved

for judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c), seeking affirmation of the

denial of benefits.  (*See* Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings ("Def.

---

[1] "R." citations are to the correspondingly numbered pages in the certified administrative record.  (*See* Doc. Entry
No. 23.)

Mem.") at 1, Doc. Entry No. 19.) Plaintiff cross-moved for judgment on the pleadings, seeking reversal of the Commissioner's decision, or alternatively, remand. (*See* Mem. of Law in Supp. of Pl.'s Mot. for J. on the Pleadings ("Pl. Mem.") at 1, Doc. Entry No. 21.) For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is granted and Plaintiff's motion for judgment on the pleadings is denied.

## BACKGROUND

### A.    Non-Medical and Self-Reported Evidence

Plaintiff was born on February 25, 1962 in Costa Rica. (R. 32.) She moved to the United States in 1976 and has a 10th grade education. (R. 32-33, 164.) From 1993 until 2006, Plaintiff performed laundry services at a nursing home. (R. 35, 164.) On August 12, 2003, Plaintiff fell at work when her left ankle got caught under a laundry bin. (R. 176.) She suffered injuries to her foot, ankles, and knees. (*Id.*) After the accident, Plaintiff returned to work on "light duty." (R. 35-36, 184.) On light duty, Plaintiff folded clothing and sheets, usually while seated. (R. 35-36.) Plaintiff was laid off on December 22, 2006 when a supervisor told her she could no longer work light duty. (R. 35, 166.) Plaintiff alleges she was disabled for the period of December 22, 2006 until February 2009, because of pain in her left ankle and significant injuries to both knees. (R. 167.) Plaintiff returned to paid work in February 2009 as a home attendant, after attending three months of training classes. (R. 164.)

### B.    Medical Evidence

#### 1.    Medical Evidence Prior to Alleged Onset Date

After her August 12, 2003 fall, Plaintiff went to Mt. Sinai Hospital in Queens, where x-rays showed no fracture and she was released with a straight cane. (R. 176.) Thereafter, Plaintiff began treatment at New York Orthopedic Surgery & Rehabilitation with Drs. Maria S.

Navedo-Rivera, M.D., a physiatrist, Christopher Kyriakides, D.O., an orthopedic surgeon, Gianni Persich, D.P.M., a podiatrist, and Steven Touliopoulos, M.D., an orthopedic surgeon. From 2003 through 2009, Plaintiff regularly attended appointments and evaluations for her ankles and knees. Dr. Persich saw Plaintiff primarily for her ankle and Drs. Touliopoulos and Kyriakides saw Plaintiff primarily for her knees.

In an October 16, 2003 report, Dr. Navedo-Rivera stated that Plaintiff had no medical history and was doing "relatively well" before her fall. (R. 176.) Dr. Navedo-Rivera noted that Dr. Persich had immobilized Plaintiff's foot and placed her in a CAM-boot for walking. (*Id.*) Plaintiff was taking Bextra 20mg everyday as needed for pain. Plaintiff indicated that, after her fall she had difficulty walking, developed severe pain and joint swelling in the left ankle, and the pain in the left leg spread to the heel, calf, and up her leg. (*Id.*) Plaintiff had returned to work on "partial duty." (*Id.*) During the physical examination, Dr. Navedo-Rivera noted puffiness on the left ankle and tenderness in the left foot, ankle, and heel areas. (R. 177.) There was pain in the left plantar surface when stretching the fascia, tightness of the Achilles tendon, and tingling over the leg. Dr. Navedo-Rivera noted Plaintiff should avoid prolonged periods of standing, walking, and heavy lifting, and should continue to use the straight cane and left ankle support sleeve during prolonged, daily activities. (*Id.*)

On November 7, 2003, Plaintiff had left foot surgery. (R. 178.) Complaints of ankle, foot, and knee pain continued. Plaintiff continued to use the straight cane and Dr. Navedo-Rivera started Plaintiff on a physical therapy program. (*Id.*)

In a January 29, 2004 report, Dr. Navedo-Rivera stated Dr. Persich saw Plaintiff for an injection in her left heel for pain. An examination revealed limited range of motion in both knees and the left ankle. (R. 182.)

In a March 1, 2004 report, Dr. Navedo-Rivera stated Plaintiff complained that her left knee pain was more severe than the right knee, that she had pain when she walked and negotiated stairs, and her pain continued in her left ankle due to her surgery. (R. 183.) An examination revealed swelling and tenderness in the left ankle/heel area and crepitus in the left knee. After being cleared by Dr. Persich to return to work, Plaintiff returned to work on "partial disability/light duty". (R. 184.) Plaintiff continued to attend physical therapy and use her straight cane. (R. 183-84.) In April 5, 2004 and May 10, 2004 reports, Dr. Navedo-Rivera noted similar findings and complaints by Plaintiff as the months prior. (R. 185, 188.) Dr. Navedo-Rivera prescribed Plaintiff Celebrex 200 mg everyday as needed for pain, with no refill, and Ultracet twice a day as needed for severe pain, with no refill. (R. 185.) Further, she advised Plaintiff to lose weight. (*Id.*)

In a September 13, 2004 report, Dr. Navedo-Rivera noted Plaintiff's complaints of pain in her legs when turning, pivoting, or wearing sandals, and in her feet when stepping out of bed. (R. 188.) Dr. Navedo-Rivera observed pain and tenderness in both ankles and knees, crepitus in the knees, and limited range of motion in the ankles. (*Id.*) She continued to advise Plaintiff to avoid prolonged periods of standing, walking, and negotiating stairs. (*Id.*) In a February 10, 2005 report, Dr. Kyriakides noted that Plaintiff had tears in the meniscus of her left knee and Dr. Touliopoulos would soon operate on her. (R. 189.) Dr. Kyriakides opined that Plaintiff remained partially disabled and worked light duty in a sedentary position. (*Id.*)

On April 13, 2005, Plaintiff had anterior cruciate ligament ("ACL") repair and reconstruction on her left knee. (R. 190.) In a June 30, 2005 report, Dr. Kyriakides noted Plaintiff was gradually improving post-surgery with physical therapy and was no longer using crutches. (*Id.*)

In a September 6, 2005 report, Dr. Kyriakides noted Plaintiff showed improvement in her knee and muscle strength, although she continued to use a straight cane. (R. 191.) Plaintiff was scheduled for a second surgery of her left ankle, but awaited approval from the Worker's Compensation Board ("WCB") to go forward. (R. 191-92.) In a January 19, 2006 report, Dr. Kyriakides noted that Plaintiff continued on light work duty. (R. 193.) He recommended WCB approve a Nerve Conduction Velocity ("NCV") study to assess tarsal tunnel syndrome and a magnetic resonance imaging ("MRI") of the right knee. (*Id.*)

On April 14, 2006, Dr. Persich performed left ankle arthroscopy on Plaintiff to repair the talar dome lesion with collateral ligament repair. (R. 236-37; 239-41 (operative report).) Dr. Persich's post-operative notes from April through June of 2006 state Plaintiff reported reduction of pain since the surgery and lateral left ankle edema. (R. 234-37.) Dr. Persich stated that Plaintiff planned to return to work on July 3, 2006 on a light duty basis. (R. 234.)

In an August 24, 2006 report, Dr. Kyriakides indicated Plaintiff had returned to work in early July 2006, but Plaintiff stated she had difficulties performing her work. (R. 197.) Dr. Kyriakides observed significant swelling. The surgery to her left ankle resulted in a consequential injury to the right side of the leg. In a December 14, 2006 report, Dr. Kyriakides indicated that the April 2006 surgery of the left ankle seemed to have "significantly improved" the ankle and Plaintiff's primary pain was now in the right knee, with residual left knee pain. (R. 199.) An MRI for the right knee would indicate whether a surgical approach was necessary. (*Id.*) Dr. Kyriakides recommended Plaintiff begin Euflexxa trial injections to benefit her overall functioning capabilities. (*Id.*)

*a.      Worker's Compensation Examination*

On October 5, 2006, a few months prior to the alleged onset of disability, at the request of Plaintiff's workers' compensation carrier, Robert L. Michaels, M.D., an orthopedic surgeon, performed an independent medical examination on Plaintiff and reviewed her medical records. (R. 223-25.)  He found Plaintiff required further orthopedic treatment for two months and recommended the WCB approve the left knee MRI and the use of a left knee ACL brace.  (R. 224-25.)  He noted Plaintiff's injuries were causally related to the 2003 work accident.  (R. 225.)  In a November 16, 2006 addendum to the October report, Dr. Michaels reviewed the left knee MRI and recommended the WCB approve Orthovisc injections.  (R. 265-66.)  In addition, a November 26, 2007 Workers' Compensation/Public Disability Benefit Questionnaire indicated Plaintiff received benefits of $70 per week.  (R. 107-08.)

2.      Medical Evidence After Alleged Onset Date

Plaintiff continued seeing Dr. Kyriakides at the New York Orthopedic Surgery & Rehabilitation Center and attended regular check-ups roughly every three months.  His notes indicated that Plaintiff stopped working on December 22, 2006, because her job stopped offering her a light duty position and she was incapable of returning to full duty.  (R. 202-03 (notes from March 1, 2007 and May 22, 2007).)  Dr. Kyriakides opined she was "incapable of returning to work on full duty basis" and "based upon her job description she is totally disabled."  (R. 202-03.)  Plaintiff continued to have pain and tenderness in her knees and left ankle, her left knee had not improved, her range of motion had decreased, and she walked with a limp.  (R. 202, 204.)  Plaintiff continued her physical therapy program and had recently received hyalgen injections. (R. 202.)

In August 8, 2007, Dr. Touliopoulos noted Plaintiff reported improvement in knee pain and stability, but the stiffness, weakness, and discomfort had significantly worsened. (R. 388.) She wore a left knee brace as needed, used a cane, and took Relafen as an anti-inflammatory medication. (*Id.*) In September 2007, Plaintiff received a series of three Euflexxa injections in her left knee. (R. 206-08.)

In a November 14, 2007 report, Dr. Touliopoulos noted Plaintiff's symptoms in her right knee persisted and were worse than her left knee, despite hyaluronic acid injections, physical therapy, use of a cane, and anti-inflammatory medication. (R. 292-93.) Dr. Touliopoulos discussed with Plaintiff the progressive nature of traumatic degenerative joint disease, that arthroscopic surgery was a possibility for her right knee, and that it was more than likely she would require total knee anthroplasty in the future. (*Id.*) In a January 15, 2008 report, Dr. Kyriakides stated Plaintiff's ankle had "resolved nicely" but there was no improvement in the left knee and observed swelling and instability in both knees. (R. 344.) In an April 10, 2008 report, Dr. Kyriakides noted only minimal improvement in both knees and recommended a bionic knee device. (R. 345.) Plaintiff continued to have limited mobility, joint tenderness, and an antalgic gait. (*Id.*)

In a July 9, 2008 report, Dr. Touliopoulos noted Plaintiff's 2005 left knee ACL reconstruction had improved her knee stability and reduced pain. (R. 389.) However, Plaintiff had developed symptoms in her left knee, which persisted despite pain injections, and right knee symptoms had worsened as well. (*Id.*) Right knee symptoms included pain and buckling. (*Id.*) Plaintiff complained of discomfort, intermittent pain, stiffness, and weakness in both knees. (*Id.*) Plaintiff attended physical therapy once a month. (R. 366-71, 389.) Dr. Touliopoulos noted Plaintiff had difficulty standing and walking for a prolonged period of time, negotiating multiple

steps, and was unable to return to work because of these injuries. (R. 389.) She was able to take public transportation, but had significant difficulty negotiating subway and bus steps. Upon examination, Dr. Touliopoulos noted crepitus in both knees, and a left knee range of motion from 0-115 and right knee range of motion is from 0-110 degrees. (*Id.*) He noted atrophy of both thigh muscles and moderate weakness, though the right thigh was worse than the left. An MRI of the right knee revealed an ACL sprain and lateral meniscus tear. (R. 389-90.) Dr. Touliopoulos also found post-traumatic degenerative joint disease in the right knee. (R. 390.) He requested authorization for custom made bilateral knee ACL braces. (*Id.*) He recommended Plaintiff continue to take Advil, perform her home exercise program, attend supportive physical therapy for both knees, and follow up with Dr. Persich as necessary. Dr. Touliopoulos described her as presently disabled from her regular employment at the laundry department. (*Id.*)

a.      *Medical Consultative Examination*

The Division of Disability Determination referred Plaintiff for an orthopedic examination. Accordingly, on March 4, 2008, Dr. Steven Calvino, M.D., a consultative physician at Industrial Medicine Associates, P.C., examined Plaintiff. (R. 309-11.) Plaintiff stated she had two left foot surgeries, one left knee surgery, and knee injections with no significant relief of pain. (R. 309.) Plaintiff reported a history of chronic left knee and left foot pain, hypertension, and a history of depression. (*Id.*) Plaintiff reported a pain level of 6 out of 10, but no radiation of pain. (*Id.*) Plaintiff attended physical therapy two to three times per week, used cold compresses, and took medications, which slightly improved her condition. (*Id.*) Plaintiff used a cane on occasion and she took Advil and Norvasc 10 mg. (R. 310.)

Plaintiff's stated her main activities were watching television, listening to the radio, reading, attending doctor's appointments and physical therapy, and socializing with friends. (R.

310.)  Plaintiff could shower and dress herself, but her sister did the cooking, cleaning, laundry, and shopping.  (*Id.*)  Dr. Calvino observed that her gait was normal, she could walk on her heels and toes without difficulty, and appeared to be in no acute distress.  (*Id.*)  He noted she did not need help changing for the exam or getting on or off the exam table.  She could perform a full squat and had the ability to rise from her chair without difficulty.  Dr. Calvino observed no problems with the spine, upper extremities, and thoracic lumbar spine.  (R. 311.)  For the lower extremities, the doctor noted full range of motion in the hips, knees and ankles, a strength of 5/5 in proximal and distal muscles and no muscle atrophy.  (*Id.*))  He noted no sensory abnormality, joint effusion, inflammation, or instability, and reflexes were normal.  (*Id.*)

Dr. Calvino conducted a physical residual functional capacity assessment ("RFC").  (R. 315-20.)  In the RFC, Dr. Calvino concluded that Plaintiff could occasionally lift or carry twenty pounds and frequently lift or carry ten pounds.  (R. 316.)  She could stand and/or walk for a total of six hours in an eight-hour workday and sit for a total of six hours in an eight-hour workday.  Her pushing and pulling was not restricted.  (*Id.*)  Dr. Calvino supported his findings with the fact that Plaintiff was a younger individual who previously worked as a laundry person, her alleged disability was due to an old injury in her left knee and left foot, and her pain management program had led to partial improvement of her condition.  (*Id.*)

Dr. Calvino took x-rays of the right and left foot.  (R. 313-14.)  Plaintiff's knee and foot x-rays were negative and muscular strength in her legs was a five out of five, with no muscle atrophy.  (R. 316.)  Plaintiff did not require assistive devices for walking and Dr. Calvino observed no inflammation or instability.  (*Id.*)  Dr. Calvino found occasional postural limitations for climbing, balancing, stooping, kneeling, crouching and crawling.  (R. 317.)

Dr. Calvino concluded that Plaintiff was mildly limited for frequent squatting, climbing, and heavy lifting or carrying. (R. 312.) He found no restriction for standing, walking, sitting, reaching, or fine motor activities of the bilateral upper extremities. (*Id.*) Plaintiff reported left knee and foot pain and hypertension. She claimed she had difficulty lifting and carrying, was unable to stand or walk for prolonged period of time, and needed help with activities of daily living. Dr. Calvino found these statements credible but not to the extent Plaintiff alleged. (R. 318-19.)

*b.* *Treating Physician's Residual Functional Capacity Assessment*

On June 29, 2009, Dr. Kyriakides completed a Residual Functional Capacity ("RFC") assessment. (R. 373-75.) Dr. Kyriakides opined that Plaintiff could sit continually for a maximum of thirty minutes, but then had to alternate her posture by walking for thirty minutes, before sitting again. (R. 373.) Plaintiff's total cumulative sitting during an eight-hour workday was two hours. The maximum Plaintiff could continuously stand or walk was about one hour, before she had to alternate her posture by lying or reclining for thirty minutes. (R. 373-74.) Plaintiff's total cumulative standing or walking during an eight-hour workday was two hours. (R. 374.) In addition to a morning break, lunch period, and an afternoon break, Plaintiff needed additional rest to relieve her pain. (*Id.*) Plaintiff could carry five pounds for less than one-third of an eight-hour period and rarely-to-never carry ten or more pounds over an eight-hour period. (R. 374-74.) Dr. Kyriakides opined that Plaintiff's condition existed and persisted with the restrictions outlined in his RFC since, at least, December 22, 2006. Dr. Kyriakides assessment was premised on a diagnosis of plantar fasciitis, abnormality of gait, tarsal tunnel syndrome, and ankle derangement. (R. 375.)

### c.     *Psychological Examination*

In addition to Plaintiff's physical difficulties, Plaintiff alleges disability due to depression.  Plaintiff has not been hospitalized or received any outpatient treatment for depression.  (R. 285.)  The Division of Disability Determination referred Plaintiff for a psychological examination.  Accordingly, on March 4, 2008, Dr. Lauree Mitchell, a consultative psychologist at Industrial Medicine Associates, P.C., examined Plaintiff.  (R. 303-07.)  Dr. Mitchell concluded that Plaintiff's difficulties were caused by psychiatric symptoms and medical conditions and recommended she begin psychological treatment to address symptoms of depression and living with pain.  The prognosis was "guarded, given the reported severity of chronic pain."  (R. 306.)

Plaintiff reported physical limitations in personal care skills.  Plaintiff lived with her mother and older sister in an apartment and had an adult son who lived on his own.  (R. 303.) She got along well with her mother, seven sisters, and son.  (R. 305.)  Plaintiff, her mother, and older sister shared cooking duties.  (*Id*.)  Plaintiff helped keep the apartment clean, though her sister did the laundry and the shopping.  Plaintiff spent time reading, watching television, knitting, going to therapy, and accompanying her mother places.  (*Id*.)  She had friends with whom she went to the movies, had coffee and visited.  (*Id*.)

Plaintiff had no acute distress in the exam and made appropriate eye contact.  She arrived alone to the exam by taxi.  Plaintiff's appearance was appropriate and her hygiene and grooming were adequate.  (R. 304.)  Plaintiff's speech and voice were clear.  (*Id.*)  She had adequate social skills and was cooperative, though her motor behavior was "somewhat restless."  She was able to do simple addition and multiplication and her IQ was assessed to be "average" with fair insight and judgment.  (*Id.*)  Dr. Mitchell opined that Plaintiff was capable of performing work-related

mental activities, carrying out and remembering simple instructions, and concentrating for extended periods of time. (*Id.*) The doctor assessed that Plaintiff was relatively cognitively intact, not psychotic or suicidal, and had a coherent and goal directed thought process. (R. 304, 254.) She found no evidence of hallucinations, delusions, or paranoia. (*Id.*) Dr. Mitchell found Plaintiff could relate appropriately to coworkers and supervisors, adapt to changes in the work-environment and deal appropriately with stress. (R. 254, 306.) She could probably maintain a regular schedule, if she had one, and was able to perform complex tasks independently. *Id.*

On March 20, 2008, a consultative examiner completed a Mental Residual Functional Capacity assessment ("Mental RFC"). (R. 252-54.) Plaintiff was "moderately limited" in the following categories: (a) "the ability to understand and remember detailed instructions;" (b) "the ability to carry out detailed instructions;" and (c) "the ability to respond appropriately to changes in the work setting." (R. 252-53.) For the rest of the categories she was "not significantly limited." Plaintiff had a normal appetite, sleep-cycle, and no cognitive symptomatology or deficits. (R. 253.) Plaintiff showed the following depressive symptomatology: dysphoric moods, psychomotor retardation, crying spells, irritability, fatigue, loss of energy, and social withdrawal. (*Id.*) The Mental RFC was largely consistent with Dr. Mitchell's consultative examination. In addition, the RFC explained that Plaintiff went out alone, used public transportation, and managed money. (R. 254.)

## C.    Hearing Testimony

On August 18, 2009, Plaintiff appeared with counsel and testified before the ALJ to review her disability claim. (R. 30-56.) A Spanish-language interpreter was present and

translated for Plaintiff.[2]  (R. 32, 34.)  Through counsel, Plaintiff requested a closed disability period from December 22, 2006 to February 2009.  (R. 34.)

1.    Plaintiff's Testimony

Plaintiff testified that between 2006 and 2009 she suffered from swelling in her foot and pain when she ascended steps.  (R. 44.)  She used a cane after her foot surgery until December 2008.  (R. 45.)  A few months after her ankle surgery, she returned to work at the laundry, but worked light duty, which required her only to fold clothing and sheets while seated.  (R. 35-36, 42.)  She worked light duty until December 2006, when a supervisor told her she could no longer work light duty and was laid off.  (R. 35, 42.)  The ALJ asked Plaintiff if she would have continued to work at the nursing home as a laundry worker if allowed to continue on light duty. (R. 37, 38.)  Plaintiff responded in the affirmative, because "it was light and I didn't have to force my leg."  (R. 37; *see also* R. 38 (responding to the same question, "[y]es, because I was under treatment and the doctor was helping me").)  Plaintiff testified that she received Worker's Compensation benefits before and after she was laid off.  (R. 39-40.)  In October 2008, Plaintiff began studying to become a home attendant because "the work was light."  (R. 41.)  The home attendant classes lasted four to five hours each day and she traveled to Manhattan from her home in Flushing, Queens to attend.  (*Id.*)  At the time of the hearing, she was working part-time as a home attendant through an agency and worked four hours a day.  (R. 34.)

2.    Medical Expert

The ALJ then examined the Medical Expert ("ME"), Dr. Spindell, who testified by telephone.  (R. 47-53.)  The ME testified that the November 2006 MRI was benign except for post-surgical findings related to her ACL reconstruction.  (R. 48.)  The 2006 x-rays of her left

---

[2] Plaintiff erroneously claims that she testified at the hearing without an interpreter.  (Pl. Mem. at 2.)  The hearing transcript clearly states that an interpreter was present, sworn, and translated for Plaintiff.  (R. 32, 34.)  The Court is troubled by Plaintiff's misrepresentation and counsel is admonished to be forthright with the Court.

ankle showed a reasonably good recovery from her April 2006 ankle surgery. (R. 49.) The ME testified that Dr. Calvino's March 2008 examination showed minimal objective findings. (*Id.*)

When the ALJ asked whether any of the injuries lasted a year or more, the ME responded in the negative and noted Plaintiff had returned to work three months after her first surgery. (R. 49-50.) The ME concluded that Plaintiff did not meet the listings. (R. 50.) Based on the record, the ME found Plaintiff was capable of performing light duty work. (*Id.*) She could lift twenty pounds occasionally and ten pounds frequently, sit and stand at will intermittently for six hours, and walk intermittently for two hours at a time. (*Id.*) Plaintiff's attorney questioned the ME about crepitus in the left knee. The ME stated that crepitus, which he described as grinding or rubbing in the knee, was a subjective finding and could be indicative of arthritis in the knee. (R. 52-53.)

### 3. Vocational Expert

The Vocational Expert ("VE"), Mr. Pasternak, testified Plaintiff's previous work was as a laundry worker since 1993. It is an unskilled job with a Specific Vocational Preparation ("SVP") of two, meaning there are no transferrable skills, and, as ordinarily performed, is rated at a medium level of physical exertion. (R. 53-55.) After her surgery, Plaintiff's employer gave her only light work to perform, which involved only folding, rather than lifting heavy bundles of laundry. (R. 54.) The ALJ asked the VE no further questions or posed any hypotheticals.

### DISCUSSION

## A.  Standard of Review

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as

the Commissioner of Social Security may allow." 42 U.S.C. § 405(g). A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F. 3d 496, 504 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F. 2d 751, 755 (2d Cir. 1982) (internal citations omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F. 3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F. 3d 770, 774 (2d Cir. 1999).

**B.    Disability Claims**

To receive disability benefits, claimants must be disabled within the meaning of the Act.

*See* 42 U.S.C. §§ 423(a), (d).  Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant bears the initial burden of proof on disability status and is required to demonstrate disability status by presenting medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, as well as any other evidence the Commissioner may require.  42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F. 2d 638, 642 (2d Cir. 1983).

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. §§ 404.1520 and 416.920.  If at any step the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends there.  First, the claimant is not disabled if he or she is working and performing "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the ALJ considers whether the claimant has a "severe impairment," without reference to age, education or work experience.  Impairments are "severe" when they significantly limit a claimant's physical or mental ability to conduct basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c).  Third, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's RFC in steps four and five.  20 C.F.R. §§ 404.1520(e), 416.920(e).  In the fourth step, the claimant is not disabled if he or she is able to perform past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age,

education and work experience.  If so, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 416.920(g).  At this fifth step, the burden shifts to the Commissioner to demonstrate that the claimant could perform other work.  *See Draegert v. Barnhart*, 311 F. 3d 468, 472 (2d Cir. 2002) (citing *Carroll,* 705 F. 2d at 642).

## C.    The ALJ's Decision

On September 4, 2009, the ALJ issued his decision denying Plaintiff's claims.  (R. 19-29.)  The ALJ followed the five-step procedure in making his determination that Plaintiff could perform past relevant work as a laundry worker, and therefore, was not disabled from the limited disability period of December 22, 2006 through the date of the decision.  (R. 20.)  At the first step, the ALJ determined that Plaintiff had not worked since December 22, 2006.  (R. 21.)  At the second step, the ALJ found the following severe impairments: internal derangements of the knees, left foot, and ankle, and depression.  (*Id.*)  At the third step, the ALJ concluded Plaintiff's impairments, in combination or individually, did not meet or equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 22-23.)

At the fourth step, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b).  (R. 23.)  The ALJ concluded Plaintiff could sit and stand/walk for a total of six hours in each activity over the course of an eight-hour workday and lift or carry twenty pounds occasionally and ten pounds frequently.  (R. 23.)  The ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effect of her symptoms were not credible to the extent they were inconsistent with the ALJ's RFC assessment.  (R. 24.)  The ALJ concluded at step four that Plaintiff was capable of performing her past relevant work as a laundry worker on light duty, "as actually performed."  (R. 29.)

17

The ALJ gave "great weight" to the testimony of the medical expert who testified at the hearing and to the opinion of Dr. Calvino, because they were well supported by, and thoroughly consistent with, the evidence of the record. (R. 28.) Similarly, the ALJ gave "substantial weight" to the opinion of Dr. Mitchell, the psychological consultant, as her opinion was consistent with her findings, the lack of treatment for Plaintiff's alleged depression, and the record. (R. 28.) The ALJ gave "little weight" to the opinion of Dr. Kyriakides, because it was contradicted by medical evidence in the record. (*Id.*)

**D. Application**

The Commissioner moves for judgment on the pleadings, seeking affirmation of Plaintiff's denial of benefits on the grounds that the ALJ applied the correct legal standards to determine that Plaintiff was not disabled and the factual findings are supported by substantial evidence. (Def. Mem. at 1; Reply Mem. of Law in Further Supp. of Def.'s Mot. for J. on the Pleadings ("Def. Reply Mem.") at 1, Doc. Entry No. 22.) Plaintiff cross-moves for judgment on the pleadings, contending the ALJ failed to properly: (1) weigh the treating physicians' opinions and develop the record; and (2) evaluate Plaintiff's credibility. (*See generally* Pl. Mem.)

1. <u>Treating Physician Rule and Duty to Develop a Full Record</u>

Plaintiff contends that the ALJ: (1) erred in giving the findings and opinions of Plaintiff's treating physicians less than controlling weight, while giving the opinions of the consulting physician and the medical expert "great weight;" (Pl. Mem. 6-13) (2) erred in not contacting Dr. Kyriakides upon discounting his functional limitation analysis; (*id.* at 6, 10) and (3) failed to explain his decision to give the treating physicians less than controlling weight. (*Id.* at 11-13.) The Commissioner contends the ALJ: (1) properly relied on the testimony of the medical expert; (Def. Reply Mem. at 1) (2) properly found the opinion of Dr. Kyriakides was not entitled to

controlling weight because it was contradicted by medical evidence in the record; (*id.* at 3) and (3) had no duty to recontact Dr. Kyriakides for clarification of his opinion. (*Id.* at 4.)

With respect to "the nature and severity of [a claimant's] impairment(s)," 20 C.F.R. § 404.1527(d)(2), "[t]he SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F. 3d 99, 106 (2d Cir. 2003). A claimant's treating physician is one "who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual." *Schisler v. Bowen*, 851 F. 2d 43, 46 (2d Cir. 1988). A treating physician's medical opinion regarding the nature and severity of a claimant's impairment is given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record." *Burgess v. Astrue*, 537 F. 3d 117, 128 (2d Cir. 2008) (quotation marks and alteration omitted). The Second Circuit has noted that "[w]hile the opinions of a treating physician deserve special respect . . . they need not be given controlling weight where they are contradicted by other substantial evidence in the record." *Lazore v. Astrue*, 443 F. App'x 650, 652 (2d Cir. 2011) (quoting *Veino v. Barnhart*, 312 F. 3d 578, 588 (2d Cir. 2002)). Where a treating source's opinion is not given controlling weight, the proper weight accorded by the ALJ depends upon several factors, including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Clark v. Comm'r of Social Security*, 143 F. 3d 115, 118 (2d Cir. 1998); *see also* 20 C.F.R. § 404.1527(c)(2).

The ALJ's adherence to the treating physician rule operates in tandem with the affirmative duty to develop a full and fair record. *See Tejada v. Apfel*, 167 F. 3d 770, 774 (2d Cir. 1999); 20 C.F.R. § 404.1512(d)-(f) (setting forth the affirmative obligations of ALJs). "It is a well-settled rule in the Second Circuit that the Commissioner must affirmatively develop the administrative record due to the essentially non-adversarial nature of a benefits proceeding." *Garcia v. Apfel*, 1999 WL 1059968, at *5 (S.D.N.Y. Nov. 19, 1999) (citing *Pratts v. Chater*, 94 F. 3d 34, 37 (2d Cir. 1996)).

After reviewing the medical evidence at issue, the Court finds the ALJ properly applied the treating physician rule. The ALJ reviewed Plaintiff's treatment history with Drs. Kyriakides, Touliopoulos, and Navedo-Rivera and then explained he did not give significant weight to Dr. Kyriakides' RFC assessment of June 29, 2009, because it was contradicted by the medical evidence in the record. Particularly, Dr. Kyriakides' extreme sitting and reclining limitations were inconsistent with the record. "When other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F. 3d 128, 133 (2d Cir. 1999).

Plaintiff's testimony and demonstrated functional abilities contradict Dr. Kyriakides' restrictions. Dr. Kyriakides opined in his assessment that Plaintiff could only sit for thirty minutes continuously and two hours total in an eight-hour workday, and Plaintiff had to recline for thirty minutes for every hour she walked or stood. (R. 272-74.) At the time of the RFC assessment, Plaintiff had been working as a part-time home attendant for five months. (R. 164.) Also, starting in October 2008, Plaintiff spent three months attending daily classes in Manhattan,

for four to five hours each day, to become a home attendant. (R. 164.) According to Dr. Kyriakides assessment, such activity would not be possible.

Furthermore, the medical evidence contradicts Dr. Kyriakides' RFC assessment. On December 14, 2006, a week before the alleged onset disability date, Dr. Kyriakides observed Plaintiff's left ankle surgery had "significantly improved" her ankle condition and Plaintiff was only "partially disabled." (R. 199.) On March 5, 2007, Dr. Touliopoulos reported that, "her left ankle is stable and hurts from time to time, although it is improving from her original injury" and concluded the condition was stable. (R. 214.) On January 15, 2008, Dr. Kyriakides noted that Plaintiff's ankle impairment had "resolved nicely," but her 2005 left knee surgery had not resulted in any improvement. (R. 344.) On November 13, 2007 and July 9, 2008 Dr. Touliopoulos observed Plaintiff's 2005 left knee surgery had improved knee stability and reduced pain, but observed degenerative joint disease in the right knee. (R. 292, 389.) Thus, the ALJ appropriately gave Dr. Kyriakides little weight as his RFC assessment was not consistent with the record and the extreme seating limitations belied his credibility.

Plaintiff argues the ALJ should have recontacted Dr. Kyriakides upon rejecting his RFC. This is not the case. "The discord between" the treating physician's stated opinion and the medical evidence "is more properly construed as a credibility issue rather than as an issue of the completeness of the administrative record." *Rebull v. Massanari*, 240 F. Supp. 2d 265, 273 (S.D.N.Y. 2002) (where a treating physician's opinion was inconsistent with the record and other treating physician's opinions, the ALJ properly accorded less weight and there was no duty to recontact). The affirmative duty to develop the administrative record does not arise where "there are no obvious gaps in the administrative record, or where the medical record is simply inconsistent with a treating physician's opinion." *Torres v. Astrue*, 2013 WL 802440, at *8-9

(E.D.N.Y. Mar. 5, 2013) (citing *Rosa v. Callahan*, 168 F. 3d 72, 79 n.5 (2d Cir. 1999); *Rebull*, 240 F. Supp. 2d at 27.)

Plaintiff also argues the ALJ erred in according great weight to the consultative physician and the medical expert. A consultative physician's opinion may constitute substantial evidence in support of the ALJ's determination. *See Mongeur v. Heckler*, 722 F. 2d 1033, 1039 (2d Cir. 1983). Here, the ALJ did not use the consultative physician's opinion in assessing the weight of Dr. Kyriakides' opinion, as his opinion was contradicted by the medical evidence presented by the other treating physicians and Plaintiff's work activities; however, the ALJ could have done so. *Id.* ("It is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence . . . and the report of a consultative physician may constitute such evidence.") Similarly, the regulations allow for the ALJ to consider opinions from medical experts on the nature and severity of a claimant's impairments and on whether her impairments equal the requirements of any impairment in the listings. *See* 20 C.F.R. §§ 404.1527(f)(2)(iii), 416.927(f)(iii). Lastly, Plaintiff's spurious allegations that the medical examiner did not understand the medical record and demonstrated "purposeful and calculated ignorance" of Plaintiff's surgeries are completely unsupported by the record and have no basis in fact.

2.      Evaluation of Plaintiff's RFC

An RFC determination indicates the most an individual can do despite his or her impairments. *See* 20 C.F.R. § 404.1545(a). An individual's RFC takes into consideration her physical and mental limitations, symptoms, including pain, and all other relevant evidence in the case record. *Id.* Specifically, with respect to physical abilities, the RFC assessment includes consideration of an individual's exertional capabilities, including her ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. § 404.1545(b). Non-exertional limitations or restrictions,

including manipulative or postural limitations, such as reaching handling, stooping, or crouching, are also considered. *Id.* The ALJ properly determined Plaintiff's RFC allowed her to do a range of "light work" and the RFC is supported by Plaintiff's testimony, demonstrated capacity to perform work activity, medical evidence, and the medical examiner's assessment.

Plaintiff's work history prior to, and immediately after, the alleged disability period is particularly instructive in determining Plaintiff's RFC for performing actual work. Plaintiff suffered injuries to her ankle and knees as a result of an August 2003 workplace accident. After the accident, Plaintiff continued to work until December 2006, during which she had ankle and knee surgeries. After each surgery she returned to work on "light duty." (*See* R. 184 (Plaintiff cleared by Dr. Persich to return to work); R. 228 (October 23, 2006 self-report that Plaintiff is tolerating light duty well).) Plaintiff testified that she stopped working because the light duty position was eliminated and she could not perform full duty at the laundry. (R. 35, 53-54.) Plaintiff testified that if her light duty position had not been eliminated, she would have continued working. *Id.* (*see also* R. 202-03 (Dr. Kyriakides states Plaintiff stopped working because her "her job does not allow her light duty position.")) She could perform light duty work because "it was light," didn't require her to "force her leg," and she was being treated by doctors. (R. 37-38) Neither Plaintiff nor her doctors suggested that she stopped working in December 2006 because her impairments had worsened to such a degree that she could no longer perform her light duty job. Notably, in opining that Plaintiff was "totally disabled" in May 2007, Dr. Kyriakides stated only that Plaintiff could not return to work "on full duty basis." (R. 203.) Furthermore, the medical evidence does not show that Plaintiff's impairments had worsened in any meaningful way to cause her to be unable to work on the alleged disability onset date. Instead, Plaintiff's long and well-documented treatment for ankle and knees problems, starting

with the 2003 work accident, show steady, constant issues with her lower extremities and a series of treatments, surgeries, and physical therapy undertaken to manage the pain and discomfort from 2003 through 2009.

Similarly, neither Plaintiff nor the medical evidence suggests that Plaintiff was able to resume work in February 2009 as a part-time home attendant because her condition improved. Plaintiff testified that she studied for three months to become a home attendant, because "the work was light." (R. 41.) The fact that during the alleged disability period, she traveled to Manhattan on public transportation each day and attended classes for four to five hours was also relevant to the RFC determination. (*Id.*) The medical records and Plaintiff's demonstrated capacity to perform work activity despite her impairments prior to the alleged onset date provide substantial evidence to support the ALJ's RFC determination.

2.  Past Relevant Work

At step four, the ALJ found that during the alleged disability period, Plaintiff could perform her past relevant work as a laundry worker, "as actually performed" on light duty. (R. 29.) "Plaintiff bears the initial burden of showing that [her] impairment prevents [her] from returning to [her] previous type of employment." *Jordan v. Apfel*, 192 F. Supp. 2d 8, 11 (W.D.N.Y. 2001) (citing *Berry v. Schweiker*, 675 F. 2d 464, 467 (2d Cir. 1982).) Plaintiff is not disabled if she can perform her past relevant work, either "as she actually performed it" or "as it is generally performed in the national economy." 20 C.F.R. § 404.1560(b)(2); *see also Ruback v. Astrue*, 2012 WL 2120473, at *10-11 (N.D.N.Y. June 11, 2012). Plaintiff has conclusively failed to meet her burden at step four.

Past relevant work is defined as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R.

§ 404.1560(b)(1); *Barrett v. Astrue*, 2012 WL 895961, at *6 (W.D.N.Y. Mar. 12, 2012). Plaintiff contends that the light duty job was "not a real job," because it was only offered through "accommodations made in the context of workers' compensation." (Pl. Mem. at 17.) Plaintiff does not support this argument with any evidence or case law. The ALJ found that Plaintiff performed light duty laundry work for three years at a substantial gainful activity level, and, therefore, appropriately found it constituted past relevant work. Plaintiff described her past work as folding sheets and clothes while seated primarily. (R. 29.) She stated that the work did not "affect poorly her leg" and medical evidence substantiated that she could she could manage the work. (R. 39, 184, 228.) Plaintiff admitted that she would have continued to work the light duty position at the laundry, if her supervisor had not eliminated the position. (R. 37-39.) Therefore, Plaintiff has not made any showing that her impairments prevented her from returning to her previous type of employment and Plaintiff has failed to satisfy her burden of proving that she cannot perform her past relevant work.

The Court is aware that the circumstances here where the past relevant work "as performed" requires less physical exertion than the work "as generally performed," differs from circumstances situation in other cases. *See, e.g., Jock v. Harris*, 651 F. 2d 133, 135 (2d Cir. 1981) (finding plaintiff could perform past relevant work, because she could perform the sedentary work generally required of cashiers, even though she could not perform her previous cashier position, which required extended periods of standing). However, the standard and regulations are clear: To survive step four "the claimant has the burden to show an inability to return to her previous specific job and an inability to perform her past relevant work generally." *Jasinski v. Barnhart*, 341 F. 3d 182, 185 (2d Cir. 2003) (citations omitted); *see also* 20 CFR § 404.1560(b)(3) ("If you can do your past relevant work[:] If we find that you have the residual

functional capacity to do your past relevant work, we will determine that you can still do your past work and are not disabled. We will not consider your vocational factors of age, education, and work experience or whether your past relevant work exists in significant numbers in the national economy.").

Moreover, the inquiry is a two-part test. The threshold question is whether plaintiff can show her impairments prevented her from performing her past relevant work "as performed." If plaintiff fails at this step, the court need not consider whether plaintiff could do the work as generally required throughout the national economy. *See Ruback*, 2012 WL 2120473, at *10-11 ("If the ALJ finds that the claimant cannot perform the functional demands and duties of her past job as she actually performed it, he will consider whether the claimant can perform the functional demands and duties of the occupation as generally required by employers throughout the national economy." (citing *Scharber v. Comm'r of Soc. Sec.*, 411 F. App'x 281, 282 (11th Cir. 2011)).

Accordingly, the ALJ properly found that Plaintiff could perform her past relevant work in a light duty position as a laundry worker "as actually performed," and, therefore, properly found Plaintiff was not disabled.

3.     Plaintiff's Credibility

The Second Circuit recognizes that subjective allegations of pain may serve as a basis for establishing disability. *Taylor v. Barnhart*, 83 F. App'x 347, 350 (2d Cir. 2010). However, the ALJ is afforded the discretion to assess the credibility of a claimant and is not "required to credit [plaintiff's] testimony about the severity of her pain and the functional limitations it caused." *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 434 (S.D.N.Y. 2010) (quoting *Rivers v. Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008)). In determining Plaintiff's credibility, the ALJ must adhere to a two-step inquiry set forth by the regulations. *See Peck v. Astrue*, 2010 WL 3125950,

at *4 (E.D.N.Y. Aug. 6, 2010). First, the ALJ must consider whether there is a medically determinable impairment that could reasonably be expected to produce the pain or symptoms alleged. 20 C.F.R. § 404.1529(b); S.S.R. 96-7p. Second, if the ALJ finds that the individual suffers from a medically determinable impairment that could reasonably be expected to produce the pain or symptoms alleged, then the ALJ is to evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which they limit the individual's ability to work. 20 C.F.R. § 404.1529(c)(1); S.S.R. 96-7p.

Where the ALJ finds that the claimant's testimony is not consistent with the objective medical evidence, the ALJ is to evaluate the claimant's testimony in light of seven factors: 1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of the pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; 5) any treatment, other than medication, that the claimant has received; 6) any other measures that the claimant employs to relieve the pain; and 7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

"If the ALJ rejects plaintiff's testimony after considering the objective medical evidence and any other factors deemed relevant, he must explain that decision with sufficient specificity to permit a reviewing court to decide whether there are legitimate reasons for the ALJ's disbelief." *Correale-Englehart*, 687 F. Supp. 2d at 435. Where the ALJ neglects to discuss at length his credibility determination with sufficient detail to permit the reviewing court to determine whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence, remand is appropriate. *Id.* at 435-36; *see also Grosse v. Comm'r of Soc. Sec.*, 2011 WL 128565, at *5 (E.D.N.Y. Jan. 14, 2011) (finding the ALJ committed legal error

by failing to apply factors two through seven); *Valet v. Astrue*, 2012 WL 194970, at *22 (E.D.N.Y. Jan. 23, 2012) (remanding because the ALJ failed to address all seven factors).

Here, the ALJ properly found that Plaintiff's testimony and allegations of total disability during the alleged closed period were generally not credible, because they were inconsistent with the record. (R. 28 ("claimant's longitudinal medical history is not consistent with her allegation of disability").) Specifically, the ALJ relied on the following evidence to contradict Plaintiff's allegations of total disability: (1) Plaintiff's ability to work light duty three months after her first surgery in 2003 and up through 2006, with only sporadic breaks after other surgeries; (2) Plaintiff's most "significant treatment," her April 2005 left knee ACL reconstruction, occurred before the alleged onset date and her condition did not significantly worsen thereafter; and (3) Plaintiff engaged in a broad range of daily living activities. (R. 27.) Further, Plaintiff's admission that she could perform her past relevant work belies her testimony that her impairments prevented her from working during the alleged disability period.

While, the Court is aware that the record contains some evidence that supports Plaintiff's subjective complaints of pain, "disability requires more than mere inability to work without pain." *Ortiz v. Chater*, 1996 WL 164485, at *4 (S.D.N.Y. Apr. 9, 1996) (quoting *Dumas v. Schweiker*, 712 F. 2d 1545, 1552 (2d. Cir. 1983)).

### 4.    Additional Evidence Submitted to the Appeals Council

Plaintiff baldly alleges that the Appeals Council failed to consider additional evidence submitted post-hearing. (Pl. Mem at 6.) Plaintiff neither cites to any evidence submitted to the Appeals Council nor explains how it would have affected the ALJ's analysis. The Commissioner contends that Plaintiff did not submit any evidence to the Appeals Council. (Def. Reply Mem. at 6-7.) The Court has reviewed all the evidence in the administrative record and

concurs with the Commissioner that Plaintiff did not submit new evidence to the Appeals Council for its consideration.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is granted; Plaintiff's cross-motion for judgment on the pleadings is denied and this action is dismissed.

SO ORDERED.

Dated: Brooklyn, New York
        March 26, 2013

_____/s/_____
DORA L. IRIZARRY
United States District Judge
